# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD MONTEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW M. SAUL[1],<br>Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:18-cv-0474- JLT<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(G)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF RICHARD MONTEZ AND AGAINST DEFENDANT ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY |

Richard Montez asserts he is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in reviewing the medical record and finding Plaintiff lacked credibility. (Doc. 20) Defendant contends the ALJ applied the proper legal standards and the decision is supported by substantial evidence. (Doc. 21)

For the reasons set forth below, the Court finds the ALJ erred in evaluating the credibility of Plaintiff's subjective complaints, and the administrative decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

///

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

## PROCEDURAL HISTORY

Plaintiff filed his applications for benefits on July 29, 2014, alleging disability beginning January 29, 2014. (Doc. 8-3 at 18) The claims were denied initially on December 12, 2014, and upon reconsideration on January 23, 2015. (*Id.*; *see also* Doc. 8-4 at 1) Plaintiff submitted a request for a hearing and testified before an ALJ on October 21, 2016. (Doc. 8-4 at 18, 35) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on January 13, 2017. (*Id.* at 18-28) The Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 31, 2018. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

Courts have a limited scope of judicial review over disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. *See Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007); *see also Hall v. Sec'y of Health, Ed. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979) ("Congress has mandated a very limited scope of judicial review of the … decisions granting or denying Social Security disability benefits"). When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclu
sion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The court "must consider the record as a whole," including "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citations omitted). Where the evidence may "reasonably support either affirming or reversing a decision," the court may not substitute its judgment for that of the ALJ. *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Once a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial evidence and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.  Relevant Medical Evidence**

Plaintiff reported he suffered a back injury in January 2014. (Doc. 8-3 at 42) He visited McHenry Medical Office for treatment and reported he was taking Aleve for his low back pain. (Doc. 8-8 at 21) He exhibited a mild reduction in his range of motion and tenderness to palpation in the lumbar and sacral spines. (*Id.*) Dr. Sophia Mohammad prescribed Ibuprofen for Plaintiff's back pain. (*Id.* at 21, 23)

The following week, Plaintiff reported Ibuprofen did not provide any help for his low back pain.

(Doc. 8-8 at 18) Plaintiff exhibited tenderness to palpation throughout his lumbar spine and paraspinal muscles. (*Id.*) Dr. Mohammad prescribed Baclofen and Tramadol for Plaintiff, and she ordered x-rays of his lumbar spine, sacrum and coccyx. (*Id.* at 18, 20) Dr. Joseph Higgins reviewed the imaging and found no "apparent fracture or subluxation" in the lumbar spine and "no evidence of sacroiliitis." (*Id.* at 27-28)

On February 19, 2014, Plaintiff reported that his pain was the same, and he found it "difficult to walk at times." (Doc. 8-8 at 15) He continued to exhibit tenderness, and Dr. Mohammad increased his prescription for Baclofen. (*Id.* at 15) Dr. Mohammad recommended that Plaintiff receive physical therapy and consider a back brace if there was no improvement. (*Id.*) She indicated Plaintiff should engage in "physical activity as tolerated," and directed him to return in two weeks. (*Id.*)

On March 4, 2014, Dr. Mohammad again found Plaintiff had tenderness in his lumbar spine. (Doc. 8-8 at 12) She referred Plaintiff to physical and occupational therapy. (*Id.*) In addition, she ordered MRIs, which were taken on April 18, 2014. (*Id.* at 12, 25-26) The MRI of the lumbar spine showed "a relatively large annual tear at the L4-5 level," "endplate degenerative changes at L5-S1," and "[m]ild multilevel lumbar spondylosis." (*Id.* at 25) The MRI of Plaintiff's sacrum and coccyx showed "[e]ndplate edema and subchondral cystic change within the superior aspect of [the] S1 [level]." (*Id.* at 26)

In May 2014, Plaintiff continued to report "acute back pain." (Doc. 8-8 at 7) Dr. Mohammad recommended Plaintiff be seen by a neurosurgeon. (*Id.*) Plaintiff continued to have prescriptions for Tramadol, Baclofen, and Ibuprofen. (*Id.* at 8)

Plaintiff returned to Dr. Mohammad in July 2014, at which time he continued to exhibit tenderness in his low back. (Doc. 8-8 at 3) Plaintiff informed Dr. Mohammad he had a consultation scheduled with a neurosurgeon and his medication remained unchanged. (*Id.* at 3-4)

Dr. F. Karl Gregorius performed a neurosurgical consultation on September 16, 2014. (Doc. 8-8 at 39) Plaintiff told Dr. Gregorius that his pain was a 5/10, and it remained unchanged with medication. (*Id.*) Dr. Gregorius determined Plaintiff's range of motion in the lumbar spine was limited to 40 degrees flexion and 20 degrees extension. (*Id.*) Plaintiff had a negative straight leg raise test. (*Id.*) Dr. Gregorius concluded Plaintiff was "not [a] surgical candidate" and recommended

4

Plaintiff receive physical therapy for six weeks. (*Id.*) If Plaintiff did not benefit from the physical therapy, Dr. Gregorius recommended Plaintiff receive a transforaminal epidural injection at the L5-S1 level. (*Id.*; *see also* Doc. 8-9 at 36)

Plaintiff had a follow-up appointment with Dr. Mohammad the following week, at which time she discussed with Plaintiff seeking a second opinion regarding surgery. (Doc. 8-9 at 36) She referred Plaintiff to physical therapy, indicating the referral was "urgent." (*Id.*)

Dr. Ritu Malik performed a consultative examination on November 19, 2014. (Doc. 9-8 at 62) Dr. Malik noted she reviewed Plaintiff's records including the MRIs from April 2014 — showing an annular tear, mild multi-level lumbar spondylosis, and degenerative changes—and notes from the neurosurgery consultation. (*Id.*) Plaintiff told Dr. Malik that he had constant back pain, for which he took "tramadol three times a week and ibuprofen three times a week." (*Id.*) He reported he also had a prescription for baclofen, but he did not take it "because he [did] not like the side effects." (*Id.*) Plaintiff described his pain as "about 5/10 without the medication and 2/10 with the medication." (*Id.*) Dr. Malik observed that Plaintiff could "sit down, stand up, and change positions without difficulty or hesitation" and "squat and rise without difficulty." (*Id.* at 63) She determined Plaintiff exhibited "mild tenderness to palpation in the lower lumbar spine," without "muscle spas, crepitus, effusion or deformity." (*Id.*) Dr. Malik found Plaintiff had a "full range" of motion in the thoracolumbar spine with flexion, extension, and later flexion, though Plaintiff "report[ed] back pain with extension." (*Id.*) Dr. Malik concluded Plaintiff "should be able to sit for at least six hours in an eight hour period" and "stand and/or walk for at least six hours in an eight hour period." (*Id.* at 63-64) She opined Plaintiff "may be limited to lifting and carrying 10 pounds frequently and 25 pounds occasionally secondary to pack pain." (*Id.* at 64) Further, Dr. Malik determined Plaintiff "may benefit from an even terrain," and "[f]requent bending, stooping and crouching may exacerbate his back pain," though he could perform these activities "on an occasional basis." (*Id.*)

In November 2014, Plaintiff reported he had not yet started physical therapy, but he was "on [a] waiting list." (Doc. 8-9 at 33) Dr. Mohammad indicated they would hold off on an epidural injection "for now." (*Id.*) At the next appointment, Dr. Mohammad prescribed omeprazole for Plaintiff to take daily. (*Id.* at 31-32)

Dr. A. Nasrabadi reviewed the available record and completed a physical residual functional capacity assessment on December 11, 2014. (Doc. 8-4 at 6-8) Dr. Nasrabadi noted Plaintiff's motor reflexes, sensory reflexes, gait, and straight leg raise tests were within normal limits at the consultative examination. (*Id.* at 8) Dr. Nasrabadi determined Plaintiff could perform medium work with postural limitations. (*Id.*) Specifically, Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, sit about six hours in an eight-hour day, and stand/or walk about six hours in an eight-hour day. (*Id.* at 7) According to Dr. Nasrabadi, Plaintiff had an unlimited ability to push and pull foot controls. (*Id.*) Dr. Nasrabadi believed Plaintiff could occasionally stoop and climb ramps, stairs, ladders, ropes, and scaffolds; and he could frequently balance, kneel, crouch, and crawl. (*Id.* at 7-8)

Dr. C. Bullard reviewed the medical record following Plaintiff's request for reconsideration of the denial of benefits on January 23, 2015. (Doc. 8-4 at 27-28) Dr. Bullard observed that light work was recommended by the consultative examiner, but found the examination was negative "save for some LS tenderness." (*Id.* at 27) Consequently, Dr. Bullard agreed with the limitation to medium work given by Dr. Nasrabadi. (*Id.*)

Dr. Mohammad completed a questionnaire on February 17, 2015. (Doc. 8-8 at 43) She indicated Plaintiff's primary impairment was "significant low back pain [secondary] to spondylosis." (*Id.*) Dr. Mohammad indicated her opinion was supported by Plaintiff's tenderness to palpation during physical exams, limited range of motion with passive and active movements. (*Id.*) According to Dr. Mohammad, Plaintiff was able to sit at one time for half an hour and stand and/or walk for half an hour at one time. (*Id.*) She believed Plaintiff could sit for one hour, and he could stand and/or walk for one hour in an eight-hour day. (*Id.*) Dr. Mohammad indicated Plaintiff should lie down or elevate his legs "about every couple of hours." (*Id.*) She concluded Plaintiff was precluded from work at any exertion level, including the sedentary level that would require lifting no more than ten pounds, sitting six hours in an eight-hour day, and walking for two hours in an eight-hour day. (*Id.*)

Plaintiff began physical therapy on March 30, 2015. (Doc. 8-9 at 46) The following month, Dr. Baltej Dosanjh found Plaintiff exhibited tenderness to palpation, and pain with flexion and extension. (*Id.* at 26) Plaintiff said that he was taking tramadol and baclofen, but he did not "like to be drowsy/groggy." (*Id.*) Because Plaintiff also reported having pain in his left shoulder, Dr. Dosanjh

requested imaging, which was performed on May 1, 2015. (*Id.* at 26, 51) Dr. Dumars reviewed the x-rays and determined Plaintiff had "[m]ild to moderate left acromioclavicular joint arthritis." (*Id.* at 51) Dr. Dumars opined the bony mineralization was normal and the soft tissues were unremarkable. (*Id.*)

In May 2015, Plaintiff completed his sixteen sessions of physical therapy. (Doc. 8-9 at 46) Matt Tresennicer, P.T., noted that Plaintiff reported "only minor improvement," and rated his progress as 10%. (*Id.*) Mr. Resennicer found "no objective changes" and "no significant progress." (*Id.*) He indicated Plaintiff could continue his therapy exercises independently. (*Id.*)

Dr. Dosanjh completed an impairments questionnaire on June 11, 2015. (Doc. 8-9 at 76) He indicated he believed Plaintiff could not perform full time work. (*Id.*) According to Dr. Dosanjh, Plaintiff was "unable to lift more than 5 lbs," and "unable to bend/ lift/ squat / crouch /or sit for long periods more than 1 [hour] or stand for 1 [hour] due to large annular tear [at] L4-L5 and endplate degenerative changes [at] L5-S1." (*Id.*) He opined Plaintiff "must lie down to help [his] back pain, about every 2-3 [hours]." (*Id.*) Dr. Dosanjh believed Plaintiff had been limited to this extent since April 2014 and noted that his opinions were based on an MRI of the lumbar spine. (*Id.*)

On June 15, 2015, Plaintiff reported he had some pain relief following physical therapy, but he continued to have pain. (Doc. 8-9 at 23) Dr. Dosanjh referred Plaintiff to receive an injection in his left shoulder joint by Dr. Juan Lopez Solzara. (*Id.* at 23, 20) Dr. Solzara observed that Plaintiff had mild tenderness in his left shoulder and a reduced range of motion. (*Id.*) He administered an injection in the left acromioclavicular shoulder joint on June 26. (*Id.* at 20, 16)

Plaintiff told Dr. Dosanjh that the joint injection "helped somewhat" in September 2015, but he had "some pain with movement and at bedtime." (Doc. 8-9 at 16) Plaintiff indicated his shoulder pain—which he described as "sharp and stabbing"— was "associated with numbness, weakness, [and] loss of sensation." (*Id.*) Dr. Dosanjh found Plaintiff had tenderness in the spine and left shoulder, and a decreased range of motion in the spine. (*Id.* at 18) Dr. Dosanjh determined Plaintiff's range of motion in the left shoulder was improved. (*Id.*) He opined that Plaintiff was "doing well with [the] current regimen" for his back pain and was "[s]omewhat improved" related to his shoulder. (*id.*)

In January 2016, Plaintiff told Dr. Dosanjh that he was "[d]oing ok, [but was] still having ongoing low back pain." (Doc. 8-9 at 12) He reported his left shoulder pain was "improved, with

some increased [range of motion]." (*Id.*) Dr. Dosanjh questioned Plaintiff about medication side effects, and Plaintiff reported he had none. (*Id.*) Dr. Dosanjh directed Plaintiff to "continue with pain control and home exercise" for his left shoulder pain. (*Id.* at 14)

In April 2016, Plaintiff reported his back pain was "somewhat controlled with meds." (Doc. 8-9 at 9) He also said that he had been suffering from intermittent diarrhea, which was worse with dairy, salsa, and avocado. (*Id.* at 6) Plaintiff reported he was exercising seven times per week and that his exercise consisted of walking. (*Id.*) Dr. Dosanjh prescribed dicyclomine for cramping and a trial of Bentyl, and he ordered a colonoscopy, which showed Plaintiff had diverticulosis. (*Id.* at 5, 8-9)

In July 2016, Plaintiff told Dr. Dosanjh he continued to have pain in his back and left shoulder, and began to have bilateral hand pain, decreased grip, and tenderness to the top of his knuckles. (Doc. 8-9 at 2) Dr. Dosanjh ordered imaging of Plaintiff's left shoulder and hands, which was completed on July 15, 2016. (*Id.* at 48-50) Dr. Monica Martinez reviewed the x-rays and opined Plaintiff had "[m]ild degenerative changes" in the right hand and a normal right hand. (*Id.* at 48, 50) In addition, she determined Plaintiff had "a thin calcification abutting the greater tuberosity of the humerus consistent with calcific tendinitis" in the left shoulder. (*Id.* at 49)

Dr. Dosanjh completed a second impairment questionnaire on September 22, 2016. (Doc. 8-9 at 61) He noted Plaintiff's diagnoses included degenerative disc disease in the lumbar spine, lumbosacral spondylosis, and a herniated lumbosacral disc. (*Id.*) Dr. Dosanjh opined Plaintiff could lift and carry less than five pounds if Plaintiff was required to lift objects for two to three hours over an eight-hour day. (*Id.*) He believed Plaintiff could sit for thirty minutes at one time or three hours in an eight-hour day and stand/walk for thirty minutes at one time or three hours in an eight-hour day. (*Id.*) Dr. Dosanjh opined Plaintiff needed to lie down and change position during the remainder of an eight-hour day. (*Id.*) Dr. Dosanjh noted that he based these opinions on Plaintiff's "ongoing back pain" and limited range of motion and strength. (*Id.*)

**B.      Administrative Hearing Testimony**

Plaintiff testified before the ALJ on October 21, 2016. (Doc. 8-3 at 35) He said he worked for Phillips Lighting and Home from 1979 to 2008. (*Id.* at 40-41) Plaintiff reported his last position with the company was as a service tech, which involved "lamp repair, fan repair, ceiling fan repair, and

clock repair." (*Id.* at 40) He estimated his work required him to lift, carry, push, or pull "anywhere from 25 to 35 pounds." (*Id.* at 41) Plaintiff reported that he was routinely "[s]tanding, walking, [and] climbing." (*Id.*) He reported that he stopped working for Phillips Lighting and Home when he was let go, attributing the loss of his employment to the economic crisis. (*Id.* at 41-42) Plaintiff reported he worked the entire year of 2012 after which he was laid off. (*Id.* at 41)

He testified that in January 2014, while doing work in his backyard, he suffered a back injury "to the point where [he] couldn't do anything." (Doc. 8-3 at 42-43) Plaintiff said he was in constant pain, which he described as "[s]harp, burning, stiffness." (*Id.* at 43) He reported his pain traveled down his left leg to the thigh. (*Id.*) Plaintiff said his pain could be exacerbated by "sitting, walking, and standing," and the longer he would sit or stand, the more difficult it became. (*Id.*) He estimated he could be on his feet for 15 minutes at one time and sit for an hour at one time. (*Id.*) Plaintiff believed he could lift and carry "[m]aybe 10 pounds," and he did not try to lift more because he knew his limitations and his back hurt if he lifted more. (*Id.* at 43-44)

He reported that he was no longer able to do yard work and hired a friend to do it. (Doc. 8-3 at 49) Plaintiff said he was primarily responsible for housekeeping, though it consisted of "light laundry and dishes and dusting," and meal preparations. (*Id.* at 52) He explained that his wife did the heavier cleaning. (*Id.*) He reported that in an eight-hour day, he spent about 30 minutes lying down and the remainder he was either sitting or on his feet. (*Id.* at 44-45) He estimated that he was standing "maybe four hours through the day" and sat the rest of the time. (*Id.* at 45) Plaintiff said he alternated between standing and walking when on his feet because it "sometimes" helped to change positions. (*Id.*)

Plaintiff said he took medication, lay down, and did stretches learned in physical therapy to relieve his pain. (Doc. 8-3 at 44, 46) Plaintiff reported he did not use heat or ice on his back because it did not help. (*Id.* at 45-46) He stated that a surgeon evaluated him for his low back pain, but the surgeon did not recommend surgery because "it would come out worse." (*Id.* at 47)

Plaintiff testified he also had issues with his left shoulder and arthritis in his right hand. (Doc. 8-3 at 47) He believed his left shoulder would pose a problem if he had a job that required "reaching all day long," because he could reach for less than half a day. (*Id.* at 47-48) He reported that he had difficulty grasping and writing due to pain in his right hand. (*Id.* at 48) Plaintiff said he took

9

medication for his shoulder, but he had "[n]ot yet" received treatment for his right hand. (*Id.*)

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of January 29, 2014. (Doc. 8-3 at 20) Second, the ALJ found Plaintiff's had a severe impairment of "degenerative disc disease with an annular tear at the L4-L5 level." (*Id.*) At step three, the ALJ found Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listing. (*Id.* at 21-22) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform medium work[2] as defined in 20 CFR 404.1567(c) and 416.967(c). He is further limited to occasional stooping and climbing of ramps, stairs, ladders, ropes, and scaffolds. He is limited to frequent balancing, kneeling, crouching, and crawling.

(*Id.* at 22, footnote added) With this residual functional capacity, the ALJ found at step four that Plaintiff was "capable of performing past relevant work as a light fixture servicer… as both customarily and previously performed." (*Id.* at 26) In the alternative, the ALJ determined at step five that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform." (*Id.*) Thus, the ALJ concluded Plaintiff was disabled as defined in the Social Security Act "from the January 29, 2014, through the date of [the] decision." (*Id.* at 27)

## DISCUSSION AND ANALYSIS

### A. The ALJ's credibility determination

To evaluate a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, where the objective medical evidence shows an underlying impairment and there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where

---

[2] Medium work entails "lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness; (2) the claimant's daily activities; (3) inconsistencies in testimony or between testimony and conduct; (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed treatment; and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart,* 278 F.3d 947, 958-59 (9th Cir. 2002).

According to the ALJ, Plaintiff's "medically determinable impairments could be reasonably expected to cause the alleged symptoms." (Doc. 8-3 at 22) However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the] decision." (*Id.*) In support of this credibility finding, the ALJ also cited the treatment received by Plaintiff and his level of activity. (*Id.* at 23)

1.     General findings

Plaintiff contends "the ALJ failed to identify what part of Plaintiff's testimony was contradicted by what specific evidence." (Doc. 16 ag 18) Plaintiff observes, "Such failure, by itself, is a[] sufficient reason to reverse and remand Plaintiff's case." (*Id.* at 19, citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 495-96 (9th Cir. 2015)) Notably, Defendant does not identify any specific citations to Plaintiff's testimony by the ALJ, and fails to address this argument. (*See* Doc. 21 at 10-11)

As Plaintiff argues, the ALJ did not clearly identify the portions of Plaintiff's testimony she rejected. For example, Plaintiff estimated he could be on his feet for 15 minutes at one time and sit for an hour at one time, lift and carry "[m]aybe 10 pounds," and his pain could be exacerbated by "sitting, walking, and standing." (Doc. 8-3 at 42-43) He estimated he could be on his feet for 15 minutes at one

11

time and sit for an hour at one time. (*Id.* at 43) These statements concerning his limitations were not rejected—or otherwise addressed— by the ALJ, who instead focused her analysis on statements previously made by Plaintiff to physicians, such as Plaintiff's report in April 2016 that "he walked for exercise seven days per week." (*See id.* at 23) Despite noting these statements, the ALJ failed to clearly explain how, or to what extent, Plaintiff's testimony was inconsistent with any prior statements, or whether his reported level of activity exceeded what was previously reported or would not consistent with his complaints.³ Instead, the ALJ offered general findings regarding Plaintiff's credibility and statements of "disabling back pain." (*See id.* at 22)

"General findings," such as the ALJ provided here, "are insufficient." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (citations omitted). The Ninth Circuit requires an ALJ to "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which pain testimony is not credible and what evidence suggests the complaints are not credible"); *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) ("The ALJ must provide 'clear and convincing' reasons to reject a claimant's subjective testimony, by specifically identifying what testimony is not credible and what evidence undermines the claimant's complaints"). Because the ALJ did not carry this burden, the Court finds the ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958.

2. Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999). However, as the Ninth Circuit explained, "summariz[ing] the medical evidence supporting [the] RFC

---

³ There is no information concerning the duration or distance Plaintiff walked, such that the Court may determine his daily exercise conflicted with his testimony that he can walk for only 15 minutes at one time. Thus, it is unclear how this prior report regarding Plaintiff's exercise supports the adverse credibility determination by the ALJ.

12

determination... is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to ... ensure that the claimant's testimony was not arbitrarily discredited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).

The ALJ made her credibility assessment and then followed it with a summary of the record related to Plaintiff's back pain, with observations related to his credibility interspersed with the summary. (Doc. 8-3 at 22) For example, the ALJ addressed the treatment Plaintiff' received when discussing the neurosurgeon's findings regarding surgery, Plaintiff's level of activity after noting he reported to physicians that he was exercising daily, and the assessments of his pain made to physicians related to the effectiveness of treatment. (*See* Doc. 8-3 at 23) However, this Court previously determined that unless the ALJ links the claimant's testimony to "the observations an ALJ makes as part of the summary of the medical record [this is] not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016).

In *Brown-Hunter*, the claimant argued the ALJ failed to provide clear and convincing reasons for rejecting her symptom testimony. *Id.*, 806 F. 3d at 491. The district court identified inconsistences in the ALJ's summary of the medical record that it opined gave rise to reasonable inferences about Plaintiff's credibility. *Id.* On appeal, the Ninth Circuit determined the ALJ failed to identify the testimony she found not credible and did not link that testimony to support the adverse credibility determination. *Id.* at 493. The Court explained that even if the district court's analysis was sound, the analysis could not cure the ALJ's failure. *Id.* at 494.

As in *Brown-Hunter*, it appears the ALJ provided sufficient analysis to support a conclusion that Plaintiff's complaints and asserted limitations were inconsistent with the medical record but failed to point specifically to the portions of the hearing testimony the ALJ found to be incredible. Indeed, it appears that the ALJ analyzes not the plaintiff's testimony but the credibility of his complaints to the medical providers when compared to his daily activities, the objective medical findings, his reports related to the effectiveness of the medication, and the conservative treatment measures. Because the ALJ failed to link her credibility findings from the medical record to Plaintiff's testimony and reject the limitations to which he testified, the ALJ made an error the Court is unable to cure. *See Brown-Hunter*,

13

806 F. 3d at 494.

### 3. Treatment received

In assessing credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged). However, "[a] claimant cannot be discredited for failing to pursue non-conservative treatment options where none exists." *LaPeirre-Gutt v. Astrue*, 382 Fed. Appx. 662, 664 (9th Cir. 2010).

Defendant notes that the ALJ considered "the overall conservative treatment" Plaintiff received as part of the adverse credibility determination. (Doc. 21 at 11) The ALJ noted Plaintiff "was prescribed ibuprofen, a nonsteroidal anti-inflammatory drug ('NSAID'), tramadol, an opioid pain medication, and baclofen, a muscle relaxant medication." (Doc. 8-3 at 23) The ALJ also observed the "neurosurgeon recommended physical therapy," which Plaintiff "participated in … between March 2015 and May 2015." (*Id.*) The ALJ concluded these "conservative treatment measures" supported the residual functional capacity she identified. (*Id.*)

The ALJ failed to address the epidural injection Plaintiff received as part of his treatment for pain. (*See* Doc. 8-9 at 16, 20) Courts have questioned whether such an injection constitutes conservative treatment. *See, e.g. Garrison v. Colvin*, 759 F.3d 995, 1015 n. 20 (9th Cir. 2014) (expressing "doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment"); *Oldham v. Astrue*, 2010 WL 2850770, at *9 (C.D. Cal. 2010) (noting that injections are "performed in operation-like settings" and finding they are not a form of conservative treatment); *Tagle v. Astrue*, 2012 WL 4364242 at *4 (C.D. Cal. Sept. 21, 2012) ("While physical therapy and pain medication are conservative, epidural and trigger point injections are not"). The record also does not show more aggressive treatment was appropriate, despite Plaintiff's "relatively large annular tear," because a neurosurgeon determined he was not a candidate for surgery. (Doc. 8-3 at 23) Accordingly, the ALJ did not properly evaluate the treatment Plaintiff received as part of the adverse credibility determination. *See LaPeirre-Gutt*, 382 Fed. Appx. at 664 (finding the ALJ erred in

considering a claimant's conservative treatment where "the record does not reflect that more aggressive treatment options are appropriate or available").

4.      Daily activities

An "ALJ [is] permitted to consider daily living activities in [a] credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Daily activities "form the basis for an adverse credibility determination" when: (1) the daily activities contradict the claimant's other testimony or (2) the daily activities meet the threshold for transferable work skills. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (factors to consider in evaluating a claimant's testimony include "whether the claimant engages in daily activities inconsistent with the alleged symptoms" and whether "the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting"). Neither of these bases is supported by the ALJ's decision or the record.

The ALJ noted Plaintiff's activities include "providing for his personal care, performing light household tasks, such as laundry, dishes, dusting, cooking and grocery shopping, and doing light yard work, including watering and some clean-up"[4] and walking for exercise seven times per week. (Doc. 8-3 at 23) The ALJ does not make any specific findings how or whether these activities transfer to a work setting. Indeed, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008). Likewise, the record does not indicate that Plaintiff could—or did—perform any of the activities identified for a substantial part of each day. Thus, Plaintiff's reported daily activities do not support the adverse credibility decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

**B.      Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*,

---

[4] Notably, Plaintiff testified at the hearing that he does *not* do yard work any longer and hired a friend to care for the yard. (Doc. 8-3 at 49)

15

211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

Importantly, courts retain flexibility in crediting testimony as true, and a remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Because the findings of the ALJ are insufficient to determine whether Plaintiff's statements should be credited as true, the matter should be remanded for the ALJ to re-evaluate the evidence.

## **CONCLUSION AND ORDER**

As set forth above, the ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. The ALJ's failure to specifically discuss and identify what portions of Plaintiff's testimony she found not credible also constituted a failure to apply the correct legal standards. Consequently, the Court should not uphold the administrative decision. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate

on these grounds it offers no findings on the remaining issues presented in Plaintiff's opening brief. Accordingly, the Court **ORDERS**:

1. Defendant's motion for summary judgment (Doc. 21) is **DENIED**;
2. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
3. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Richard Montez and against Defendant, Andrew M. Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **June 25, 2019**                     **/s/ Jennifer L. Thurston**
                                                              UNITED STATES MAGISTRATE JUDGE